David C. Parisi (SBN 162248)
Suzanne Havens Beckman (SBN 188814)
Parisi & Havens LLP
15233 Valleyheart Drive
Sherman Oaks, CA 91403
Ph: (818) 990-1299
Fax: (818) 501-7852
dparisi@parisihavens.com
shavens@parisihavens.com

Counsel for Plaintiffs Michael Walsh,
an individual, on his own behalf and
on behalf of all others similarly situated

FILED

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
SANTA ANA
2009 JUN 18 PM 2: 06
BY:

# IN THE UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| MICHAEL WALSH, an individual, on his own behalf and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>WASHINGTON MUTUAL BANK, HENDERSON, NEVADA; JPMORGAN CHASE BANK, N.A.; and DOES 1 through 50, Inclusive<br><br>Defendants, | CASE NO.: **CV09-4387 RSWL(ANX)**<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>(1) Declaratory Relief;<br>(2) Violation of TILA and Regulation Z;<br>(3) Violation of TILA and Regulation Z;<br>(4) Breach of Contract;<br>(5) Breach of Implied Covenants;<br>(6) Unjust Enrichment;<br>(7) Unfair Business Practices in Violation of Calif. Bus. & Prof. Code §§ 17200, *et seq.*; and<br>(8) Unfair Business Practices in Violation of Calif. Bus. & Prof. Code §§ 17200, *et seq.*.<br><br>**DEMAND FOR JURY TRIAL** |

Michael Walsh ("Walsh" or "Plaintiff"), for his complaint, alleges as follows upon information and belief, based upon, inter alia, investigation conducted by his attorneys, except as to those allegations pertaining to Plaintiff and his counsel personally, which are alleged upon personal knowledge:

**Introduction**

1.    This case is about Defendants' illegal reduction of credit limits on home equity lines of credit ("HELOCs") across the country.  JPMorgan Chase Bank, N.A. ("Chase"), and its recently acquired division, Washington Mutual Bank ("WAMU") (collectively "Defendants"), in an attempt to limit their exposure to the risk of collapse in the United States housing market, have violated Regulation Z and the Truth in Lending Act and have broken contractual promises to their HELOC account holders (collectively "Class members") by using reduction standards contrary to federal regulations and by reducing or freezing these customers' credit limits without first reasonably assessing the value of each affected property or otherwise having a sound factual and legal basis for reducing or suspending the accounts.  As a result, the Defendants have collectively denied their customers access to hundreds of millions of dollars worth of credit at a critical time.

2.    Each member of the Class had a HELOC for which Chase or WAMU reduced the available credit in a manner that was both illegal and unfair.  As a result of Defendants' wrongful actions, Plaintiff Walsh brings this class action on behalf of himself and the putative class and sub classes for actual damages and attorneys fees under Regulation Z of the Truth-in-Lending Act ("TILA") (15 U.S.C. § 1640(a); 12 C.F.R. § 226.5(b)), equitable and injunctive remedies under California's Unfair Competition Law ("UCL") (Cal. Bus. & Prof. Code § 17200 *et. seq*.) and damages for breach of contract.

**Nature of the Claim**

3.    As recently as April 2009, Defendants sent a form letter to thousands of their HELOC customers, including Plaintiff and the other class members, summarily lowering their lines of credit.  The letter stated:

> With home values continuing to fall in many parts of the country, a recent review of your account identified a decline in the value of the property securing your HELOC since the date you applied for your HELOC or HELOC increase.  Unfortunately the new value no longer supports

the full credit line.  Therefore, the credit limit on your account has been reduced to [insert amount] effective [insert date].

(See "April 17, 2009 Notice of HELOC Reduction" received by Plaintiff, a true and accurate copy of which is attached as Exhibit 1.)

4.    The letter does not disclose the initial or supposed present value of the property, the amount by which the property has supposedly decreased, or the methodology used to compute the decline in home value or other figures.  Rather, on a second page for "Frequently Asked Questions" the letter states:

Q:    Why has my credit line been suspended?
A:    We've used a proven valuation method to estimate your home's value.
         Unfortunately, that valuation no longer supports the amount of your Line of Credit, so the account has been suspended from additional advances, as of the date of this letter.
                                                …

Q:    How did you obtain the value for my property?
A:    We use a standard method within the industry to obtain an updated value  on the property.

(See Ex. 1.)

5.    Chase and WAMU lacked a sound factual basis for sending these letters and reducing or freezing their customers' HELOC limits.  Defendants knowingly and intentionally used faulty and dubious automated formulas, with unreliable and inaccurate analyses, formulas, equations, and processes vulnerable to manipulation, including but not limited to Automated Valuation Models ("AVMs"), to unreasonably undervalue the homes so as to falsely trigger Chase and WAMU's right to freeze or lower the credit limits.  Furthermore, Defendants ignored the federal regulation's definition of significant decline in value and instead used their own standards to purportedly grant them the right to freeze HELOC accounts or reduce credit limits.  As a result, Defendants, in violation of federal law, reduced the credit limits and/or froze the HELOC accounts of many homeowners, including Plaintiff, whose property values had not declined significantly.

6.     While federal law permits Defendants to reduce credit limits if an individual property securing a HELOC significantly declines in value, it violates federal law to reduce the credit limits of HELOC accounts without first assessing the value of the collateral that secures each affected HELOC account, having a sound factual basis for reducing or freezing HELOC credit limits, or using a triggering event not provided for by Regulation Z.   As a result, Defendants' intentional systematic, freezing and mass reduction on the limits on their customers' HELOCs, their intentional systematic concealment of their processes, standards and requirements for reduction, suspension or re-instatement, and their use of standards that are inconsistent with Regulation Z was and remains illegal.

7.     Defendants' post-reduction handling, management and administration of customer complaints, inquiries and attempted appeals are likewise unfair and illegal.  When a customer initiates an appeal, Defendants withhold necessary and material information, including but not limited to the actual valuation of the real property securing the HELOC at the time of the HELOC's origination or increase, the balance of any first mortgage at those times, the purported present value of the property Chase is using to determine the extent of the purported decline, the value required for reinstatement, or the method and/or standards used to determine these values.  This information is material and needed by the customer in order to determine whether an appraisal should be ordered.

8.     Defendants' HELOC reductions are not only illegal, they are patently unconscionable.  On October 3, 2008, Congress passed the Emergency Economic Stabilization Act of 2008, Pub. L. No. 110-343.  As part of this law, Chase obtained, on information and belief, approximately $25 billion from an unprecedented $700 billion bailout funded entirely by American taxpayers.  The rationale advanced for the bailout by its proponents was that the banks needed the money to ensure liquidity in the face of the worsening subprime mortgage disaster.

9.    Despite Chase's statements to Congress to the contrary1, Defendants have intentionally failed to meet their obligations to their customers and have intentionally deprived those customers of crucial affordable consumer credit at a critical time.

10.   In stark contrast, Defendants' HELOC borrowers such as Plaintiff, like most American consumers, are struggling in a faltering economy, yet they continue to meet their mortgage obligations.  These customers have incurred appraisal fees, an increased price of credit and reduced credit scores, lost interest and other damages.

**Parties**

11.   **Plaintiff Michael Walsh:**  Walsh maintains his primary residence in Garden Grove, California (the "subject matter property").  In or around August 2003,  Walsh obtained a HELOC in the amount of $100,000 secured by the subject matter property.

12.   **Defendant Washington Mutual Bank, Henderson, Nevada:** WAMU is a national banking association with its main office located at 2273 North Green Valley Parkway Henderson, Nevada, 89014.  On September 25, 2008, the United States Office of Thrift Supervision (OTS) seized WAMU from its holding company, Washington Mutual, Inc., and placed WAMU into the receivership of the Federal Deposit Insurance Corporation ("FDIC").  The FDIC sold the banking subsidiaries, minus unsecured debt or equity claims, to Chase for $1.9 billion. Chase specifically assumed "all mortgage servicing rights and obligations of" WAMU, including WAMU's HELOC accounts.  WAMU is now operated as a subsidiary and/or division of co-Defendant Chase.

---

[1]    *See* Testimony of Jamie Dimon, Chairman & CEO, JPMorgan Chase & Co., House Financial Services Committee, Feb. 11, 2009, a true and accurate copy of which is attached as Exhibit 2.

13.  **Defendant JPMorgan Chase Bank, N.A.:**  Chase is a national banking association with its main office located at 1111 Polaris Parkway Columbus, OH 43240.  Under the Purchase and Assumption Agreement, Chase specifically assumed "all mortgage servicing rights and obligations of" WAMU, including WAMU's HELOC accounts.  Chase operates and/or controls WAMU as a subsidiary and/or division.

14.  Plaintiff is currently ignorant of the true names and capacities, whether individual, corporate, associate, or otherwise, of the defendants sued herein under the fictitious names Does 1 through 50, inclusive, and therefore, sue such defendants by such fictitious names.  Plaintiff will seek leave to amend this complaint to allege the true names and capacities of said fictitiously named defendants when their true names and capacities have been ascertained.  Plaintiff is informed and believes and based thereon alleges that each of the fictitiously named Doe defendants is legally responsible in some manner for the events and occurrences alleged herein, and for the damages suffered by Plaintiff.

15.  Plaintiff is informed and believes and based thereon alleges that all defendants, including the fictitious Doe defendants, were at all relevant times acting as actual agents, conspirators, ostensible agents, partners, joint venturers, aiders and abettors, and/or employees of all other Defendants, and that all acts alleged herein occurred within the course and scope of said agency, employment, partnership, and joint venture, conspiracy or enterprise, and with the express and/or implied permission, knowledge, consent, authorization and ratification of their co-defendants; however, each of these allegations are deemed "alternative" theories whenever not doing so would result in a contraction with the other allegations.

## Jurisdiction and Venue

16.  This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1332(d)(2).  This Complaint alleges claims on behalf of a national class of homeowners who are minimally diverse from Defendants.  On information and

belief, the aggregate of these claims exceeds the sum or value of $5,000,000. This Court further has federal question subject matter jurisdiction under 28 U.S.C. § 1331 as this action arises in part under Regulation Z of the Truth in Lending Act, 15 U.S.C. § 1647, 12 C.F.R. § 226.5(b). This Court has supplemental subject matter jurisdiction over the pendent state law claims under 28 U.S.C. § 1367.

17. Defendant WAMU is a national banking association whose main offices are in Nevada, and is considered a citizen of Nevada for the purposes of diversity jurisdiction under 28 U.S.C. § 1348 and Wachovia Bank, N.A. v. Schmidt, 546 U.S. 303 (2006).

18. Defendant Chase is a national banking association whose main offices are in Ohio, and is considered a citizen of Ohio for the purposes of diversity jurisdiction under 28 U.S.C. § 1348 and Wachovia Bank, 546 U.S. 303.

19. Venue is also proper before this Court under 28 U.S.C. § 1391(b)(2) as a substantial part of the events, circumstances, and omissions giving rise to these claims occurred in this District.

20. This Court has personal jurisdiction over Defendants under Cal. Code Civ. Proc. § 410.10 because some of the acts alleged herein were committed in California (specifically in the Central District of California), and because Defendants are registered to do business in this state and actively conduct business in this District.

**Allegations as to Plaintiff's Individual Claims**

21. In or around August 2003, Defendant WAMU and Walsh entered into a HELOC agreement under the terms of which WAMU provided Walsh a $100,000 line of credit secured by a mortgage on the subject matter property. On information and belief, WAMU's valuation of the subject matter property at the time the HELOC was granted was $490,000.

22. On April 20, 2009, Defendants mailed Walsh a letter indicating that they had reduced Walsh's credit limit from $100,000 to $16,300 – an amount just

over the outstanding balance.  The letter was dated April 17, 2009 and stated that, effective the day before, April 16, 2009, the Defendants were lowering his credit limit "due to a substantial decline in the value of the property securing the Account."  (See Ex. 1).  No further explanation or rationale for this statement was provided.

23.  Following the notice, Walsh contacted Defendants' customer service representatives on numerous occasions and repeatedly requested the basis for the decision to reduce his HELOC credit limit, the values used to compute the decline, and a copy of the paperwork in the Defendants' possession upon which the values were based.  During these calls, the different members of WAMU and/or Chase's customer service department gave Walsh varying and conflicting stories, explanations and values.

24.  For example, on or about May 5, 2009, a customer service representative stated that the value of the subject matter property had fallen below $475,000 in contravention of the original mortgage agreement.  When Walsh eventually received a package from Defendants in response to his numerous requests for information, none of the loan documentation contained any provision requiring the property to maintain a value above $475,000.  This is because, on information and belief, no such provision existed.  During the call, the customer service representative further indicated to Mr. Walsh that Defendants are entitled to lower HELOC credit limits when the value of the unencumbered equity is reduced by 5%, despite Regulation Z's illustration that permits such reductions when the unencumbered equity has been reduced by 50% and the official commentary of Regulation Z, 226.5b(f)(3)(i), which provides:

> A creditor may not include any "triggering events" or responses that the regulation expressly addresses in a manner different from that provided in the regulation.  For example, an agreement may not provide that the margin in a variable-rate plan will increase if there is a material change in the consumer's financial circumstances, because the regulation specifies that temporarily freezing the line

or lowering the credit limit is the permissible response to a
material change in the consumer's financial circumstances.
Similarly a contract cannot contain a provision allowing
the creditor to freeze a line due to an insignificant decline
in property value since the regulation allows that response
only for a significant decline.

On information and belief, Defendants' HELOC policies, practices and contracts with Plaintiff and the other Class and Subclass members unlawfully purport to allow them to lower credit limits or suspend HELOC accounts due to insignificant declines in property values and/or include other "triggering events" that the regulation expressly addresses in a manner different from that provided in the regulation.

25. During a subsequent telephone call on or about May 15, 2009, a different a customer service representative indicated that the reduction occurred because, purportedly, the original value of the property was $502,589 and an AVM performed in April 2009 shows the property had fallen to $466,300. Despite the fact Chase's own AVM purportedly showed the property to be worth $466,300, during that same telephone call the customer service representative notified Walsh, inexplicably, that he would need an appraisal showing the value of the subject matter premises to be at least $412,353. Walsh requested Defendants' send him documentation showing the original appraisal amount of $502,589 and the customer service representative stated such information would be sent to Walsh.

26. On information and belief, the value of the subject matter property at the time of the origination of the HELOC was $490,000 and thus the value of $502,589, quoted by Defendants' representatives, is, on information and belief, incorrect, unsubstantiated and arbitrary. Walsh has made numerous requests for the copies of the original HELOC agreement in Defendants' possession, and the documents by Defendants to date do not support such a valuation and, on further information and belief, Defendants have no documents to support such a valuation, despite the fact Walsh was charged a fee for the performance of such a valuation when the HELOC was first entered into. Ultimately, under either initial value,

$502,589 or $490,000, Defendants acted without legal authority when they caused Walsh's HELOC to be frozen or the credit limit reduced because by their own calculation the subject matter property is worth $466,300.

27.   Walsh's HELOC with Defendants was his primary line of credit. Defendants' reduction of the credit limits on Walsh's HELOC dramatically increased the ratio of credit Walsh used to the amount of credit he had available.  In turn, on information and belief, Defendants' acts drove up Walsh's Credit Utilization Rate ("CUR"), a major component of his credit rating.  In addition to depriving Walsh of the availability of his HELOC, Defendants' acts damaged Walsh's credit rating and increased the cost of credit to him.

### Class Certification Allegations

28.   Plaintiff seeks certification of a class and one subclass under both  Fed. R. Civ. P. 23(b)(2) and Rule 23(b)(3).

29.   Definition of the Class and Subclass:  Pursuant to Fed. R. Civ. P. 23:

A.      Walsh brings this Complaint against Defendants on behalf of the "Class," consisting of:

> All persons in the United States who had a home equity line of credit reduced or suspended by Defendants WAMU and/or Chase where Defendants maintained, based on faulty valuation models or triggering events not allowed by Regulation Z, that the reduction or freezing was due to a substantial decline in the value of the property securing the HELOC.

B.      Walsh also brings this Complaint against Defendants on behalf of a notice sub-class (the "Notice Subclass") consisting of:

> All Class Members in the United States who received from WAMU or Chase the "Important Notice About Your Home Equity Line of Credit" and FAQ.

Excluded from the Class and Notice Subclass are 1) any Judge or Magistrate presiding over this action and members of their families; 2) Defendants, Defendants' subsidiaries, parent companies, successors, predecessors, and any entity in which Defendants or their parent companies have a controlling interest and their current or

former employees, officers and directors; 3) persons who properly execute and file a timely request for exclusion from the class; 4) the legal representatives, successors or assigns of any such excluded persons; and 5) HELOC accountholders who have had their credit line(s) restored.

30.   Plaintiff anticipates that amending the Class and Subclass definitions may become necessary following discovery.

31.   **Numerosity:**  The exact number of the members of the Class and Notice Subclass is unknown and is not available to Walsh, but it is clear that individual joinder is impracticable.  Defendants sent their generic credit line reduction letters to thousands of mortgagors, and a substantial percentage of the recipients of these letters fall into the definition of the Class and Subclass.  Class members can be easily identified through Defendants' records and public records.

32.   **Commonality:**  Common questions of fact and law exist as to all members of the Class and Notice Subclass and predominate over the questions affecting only individual members.

33.   These common questions include:

a.      What were Defendants' criteria for reducing the credit limits on its HELOCs;

b.      What were Defendants' methods for valuing the homes securing the HELOCs;

c.      Whether Defendants had a sound factual basis for reducing HELOC limits based on purported significant declines in home values;

d.      Whether Defendants' criteria for reducing HELOC credit limits, methods for valuing home values securing HELOCs, and ultimate reduction of HELOC limits violated Regulation Z;

e.      Whether Defendants' reduction of the credit limits breached the terms of its HELOC agreements;

f.     Whether Defendants' HELOC agreement terms imposed contractual obligations on Defendants to have a sound factual basis before lowering HELOC limits due to a purported significant decline in value of the property securing the HELOC;

g.     Whether Defendants' reduction of the credit limits on their HELOC agreements was unfair and unlawful;

h.     Whether Defendants gave lawful and fair notice to customers that their HELOCs were being reduced and the specific reasons for such reductions;

i.     Whether Chase and WAMU used different notices and standards for determining whether to reduce credit limits or prohibit additional extensions or advances of credit to WAMU originated HELOCs as opposed to Chase originated HELOCs;

j.     Whether Defendants' contracts and policies improperly purport to allow them to reduce credit limits or freeze HELOC accounts due to insignificant declines in property values or otherwise use triggering events inconsistent with federal law;

k.     Whether Walsh and the Class members are entitled to relief, and the nature of such relief.

34.  **Typicality:**  Walsh's claims are typical of the claims of other members of the Class and the Notice Subclass, as Walsh and other members sustained damages arising out of the wrongful conduct of Defendants, based upon the same transactions which were made uniformly to Walsh and the public. The California and federal laws under which Walsh's claims arise do not conflict with the laws of any other state in any material way.

35.  **Adequate Representation:**  Plaintiff will fairly and adequately represent and protect the interests of the members of the Class and Notice Subclass, and has retained counsel competent and experienced in complex class actions.

1    Plaintiff has no interest antagonistic to those of the Class or the Subclasses and

2    Defendants have no defenses unique to Plaintiff.

3    36. **Predominance and Superiority:** This class action is appropriate for

4    certification because class proceedings are superior to all other available methods

5    for the fair and efficient adjudication of this controversy, since joinder of all

6    members is impracticable. The damages suffered by the individual members of the

7    Class and Notice Subclass will likely be relatively small, especially given the

8    burden and expense of individual prosecution of the complex litigation necessitated

9    by the actions of Defendants. It would be virtually impossible for the individual

10   members of the Class to obtain effective relief from the misconduct of Defendants.

11   Even if members of the Class themselves could sustain such individual litigation, it

12   would still not be preferable to a class action, because individual litigation would

13   increase the delay and expense to all parties due to the complex legal and factual

14   controversies presented in this Complaint. By contrast, a class action presents far

15   fewer management difficulties and provides the benefits of single adjudication,

16   economy of scale, and comprehensive supervision by a single Court. Economies of

17   time, effort, and expense will be fostered and uniformity of decisions will be

18   ensured.

19   37. **Policies Generally Applicable to the Class:** This class action is also

20   appropriate for certification because Defendants have acted or refused to act on

21   grounds generally applicable to the Class and Notice Subclass, thereby making

22   appropriate final injunctive relief or corresponding declaratory relief with respect to

23   Class as a whole. The policies of Defendants challenged herein apply and affect

24   members of both Class and Notice Subclass uniformly, and Plaintiff's challenge of

25   these policies hinges on Defendants' conduct, not on facts or law applicable only to

26   Plaintiff.

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### Count I:  Declaratory Relief Under TILA and Regulation Z
**(on behalf of Walsh and the Class against WAMU and Chase**)

38.   Plaintiff incorporates the above allegations by reference.

39.   The Truth-in-Lending Act ("TILA") and its implementing regulation (Regulation Z) prohibit Defendants from changing any of the terms of a mortgage or HELOC, including the credit limit.  15 U.S.C. § 1647(c)(1); 12 C.F.R. § 226.5b(f)(3).  There is an exception under TILA and Regulation Z for any period in which "[t]he value of the  dwelling that  secures the [HELOC] declines significantly below the dwelling's appraised value" for the purpose of the plan which permits Defendants to reduce the credit limits on their  HELOCs.  15 U.S.C. § 1647(c)(2)(B); 12 C.F.R. § 226.5(b)(f)(3)(vi)(A).

40.   TILA and Regulation Z prohibit Defendants from reducing the credit limits on their  HELOCs unless the value of the home securing the credit line has actually declined significantly. "Significant decline" for purposes of 12 C.F.R. § 226.5b(f)(3)(vi)(A) has been interpreted as a decline in home value so that "the initial difference between the credit limit and the available equity" based on the property's appraised value for the purposes of the plan  "is reduced by fifty percent."  The Official Staff Commentary further states that Regulation Z "does not require a creditor to obtain an appraisal before suspending credit privileges [but] a significant decline must occur before suspension can occur."  On August 26, 2008, the Office of Thrift Supervision issued official guidance that warned it would violate Regulation Z, for example, to "reduce the credit limits of all HELOC accounts in a geographic area in which real estate values are generally declining without assessing the value of the collateral that secures each affected HELOC account."  (Emphasis in original).

41.   Before reducing the limits of their customers' HELOCs, Defendants had an obligation to have a sound factual basis for concluding that the value of the homes had actually declined significantly.  Plaintiff alleges on information and

belief that, instead, Defendants knowingly and intentionally used a variety of dubious formulas and unreliable data to manipulate the values of their HELOC account holders' homes in order to justify the blanket reductions on HELOC limits. On information and belief, Defendants' valuation methodology was flawed in that Defendants or their agents, acting under their direction and control, failed to, among other acts or omissions: (1) accurately represent the value of the property at the origination of the HELOCs, the value necessary to reinstate the HELOCs, and the reasoning behind the use of those values, (2) validate their AVMs on a periodic basis to mitigate the potential valuation uncertainty, (3) properly document the validation's analysis, assumptions, and conclusions, (4) appropriately back-test representative samples of the valuations against market data on actual sales, (5) account fairly for improvements, property type or geographic comparables, (6) take other necessary steps to reasonably verify the accuracy of the valuations.

42. Furthermore, and contrary to the representations made by Defendants' customer service representatives, it violates the TILA and Regulation Z to reduce Plaintiff and the class's HELOC limits in the event of the 5% reduction in value of the property securing the HELOC and/or to otherwise use triggering events that are inconsistent with the events set forth in Regulation Z. Additionally, and again contrary to the representations made by Defendants' customer service representatives, none of the original loan documentation seen or agreed to by Walsh ever required the property maintain a minimum value of $475,000 or that a 5% drop could trigger a freezing of the line and, in any case, it violates Regulation Z to include and enforce such triggering events.

43. Defendants violated the TILA and Regulation Z by reducing Plaintiff's HELOC limit in the absence of the "significant decline" in the subject matter property value. The subject matter property has not significantly declined in value. The subject matter property was initially valued at $490,000; the first mortgage taken by Plaintiff at that time totaled $293,000, and the HELOC limit was $100,000,

1  rendering unencumbered equity at the origination of $77,000. Thus, under

2  Regulation Z, Defendants could potentially reduce the HELOC limit had the

3  property value declined by $38,500, i.e. dropped below $451,500 ($490,000 -

4  $38,500). Given Defendants' oral representations that their AVM shows the present

5  value of the subject matter property is $466,300, the reduction of Plaintiff's HELOC

6  limit was contrary to Regulation Z.

7         44. In the alternative, even if this Court accepts Defendants' claimed

8  original appraisal value of the subject matter property at $502,589 the reduction of

9  Plaintiff's HELOC limit was nevertheless unlawful. In that case, the initial

10  unencumbered equity totaled $109,589 ($502,589 - $293,000 - $100,000); thus,

11  Defendants could claim "significant reduction" if the property value declined by

12  $54,794.50, i.e. drops below $447,794.50 ($502,589 - $54,794.50). Again, given

13  Defendants' present valuation of the subject matter property at $466,300, the

14  reduction of Plaintiff's HELOC limit violated the TILA and Regulation Z.

15         45. Plaintiff and the other members of the Class have additionally been

16  harmed because Defendants have knowingly provided late notice, and have

17  knowingly failed to disclose information that would permit Plaintiff and the Class

18  members to fairly determine whether to obtain an appraisal or otherwise challenge

19  the Defendants' action, including but not limited to:

20         a.    how Defendants determine or define "decline in value,"

21         b.    how Defendants compute the value of the properties,

22         c.    the actual threshold value Defendants require a customer to have an

23         appraisal state the property is worth, and Defendants' methods for computing

24         that value, so that WAMU and/or Chase will reinstate or unfreeze the

25         HELOCs,

26         d.    Defendants' actual and specific reasons for the reduction of the

27         HELOCs,

28

e.    The process, procedures, and guidelines pursuant to which Defendants implemented their reduction /cancellation of the HELOCs; and

f.    other necessary and material information.

46.   The Class and Defendants have adverse legal interests, and there is a substantial controversy between the Class and Defendants of sufficient immediacy and reality to warrant the issuance of a declaratory judgment as to whether Defendants' mass reduction of credit limits violates TILA and Regulation Z.

47.   Walsh, on his own behalf and behalf of the other Class members, seeks a declaratory judgment under 27 U.S.C. § 2201 that Defendants' mass reduction of HELOC credit limits in connection with their letter violates TILA and Regulation Z.

### Count II: Violation of the TILA and Regulation Z
**(on behalf of Walsh and the Class against WAMU and Chase)**

48.   Plaintiff incorporates the above allegations by reference.

49.   Defendants knowingly lacked a sufficient factual basis for reducing Plaintiff and the Class's credit limits or prohibiting additional extensions of credit. Defendants lacked a sound factual basis for concluding the homes securing the HELOCs for Walsh and other Class members had declined in value so as to support reducing the credit limits or prohibiting additional extensions of credit. Defendant also used improper formulas and triggering events for determining when such a "significant decline" had occurred.

50.   Defendants' reduction of the credit limit for Walsh and other Class members' HELOCs violated the Truth-in-Lending Act and Regulation Z.

51.   Defendants' violations of the Truth-in-Lending Act and Regulation Z damaged Walsh and the other Class members. These damages occurred in the form of the increased price of credit, adverse effects on credit scores, loss of interest, and other damages.

52.   Walsh, on his own behalf and behalf of the other Class members, seeks actual damages under 15 U.S.C. § 1640(a)(1), statutory damages under 15 U.S.C. §

1640(a)(2) (B), and costs of the action, together with a reasonable attorney's fees under 15 U.S.C. § 1640(a)(3).

### Count III: Violation of the TILA and Regulation Z
**(on behalf of Walsh and the Notice Subclass against WAMU and Chase)**

53. Plaintiff incorporates the above allegations by reference.

54. Where a creditor prohibits additional extensions of credit or reduces the credit limit, "the creditor shall mail or deliver written notice of the action to each consumer who will be affected. The notice must be provided not later than three business days after the action is taken and shall contain specific reasons for the action." Regulation Z, 12 C.F.R. § 226.9(c)(3).

55. On information and belief, Defendants provided Plaintiff and the members of the Class notices of their HELOC reductions which were untimely and/or that did not contain specific reasons for the action in violation of 12 C.F.R. § 226.9(c)(3).

56. The notices fail to provide HELOC customers with enough information to determine whether they should spend the time and resources to get an appraisal. Despite the notice's own recognition that the customers' HELOC agreements and federal law requires a "significant decline in collateral value" prior to prohibiting additional extensions of credit or reducing the credit limit, the notices are devoid of any specific reasoning beyond there being a general "decline in value" based on a "proven" and "standard method within the industry." The notices do not reveal how Defendants determine or define "decline in value," how Defendants compute the value of the subject matter homes, or the threshold value a customer needs to have an appraisal state the property is worth (and Defendants' methods for computing that value) so that WAMU and/or Chase will reinstate or unfreeze the HELOCs. Instead, the notice requires customers to participate in an unfair appeals process wherein Defendants refuse to make clear the values needed for

reinstatement, or the method or bases for determining those values in the first instance.

57.   Defendants' violations of the Truth-in-Lending Act and Regulation Z damaged Walsh and the other Class members.  These damages occurred in the form of the increased price of credit, adverse effects on credit scores, loss of interest, and other damages.  Walsh, on his own behalf and behalf of the other Notice Subclass members, seeks actual damages under 15 U.S.C. § 1640(a)(1), statutory damages under 15 U.S.C. § 1640(a)(2) (B), and costs of the action, together with a reasonable attorney's fee under 15 U.S.C. § 1640(a)(3).

### Count IV:  Breach of Contract
### (on behalf of Walsh and the Class against WAMU and Chase)

58.   Plaintiff incorporates the above allegations by reference.

59.   Walsh and the other Class members obtained HELOCs from Defendants.  The terms of these HELOCs constitute a contract between the Class members and Defendants.

60.   The HELOC agreements contain a term that provides:

> we can suspend additional extensions of credit or reduce your Credit Limit during any period in which any of the following are in effect:  (a)  The value of the property declines significantly below the value as determined by us at the time you applied for your Credit Line Account. This includes, for example, a decline such that the difference between the Credit Line and the available equity is reduced by fifty percent (50%) and may include a smaller decline depending on individual circumstances.

Defendants drafted these agreements, which contemplate on their face triggering events that are contrary to those set forth in Regulation Z.

61.   Walsh and the other Class members made all payments due to Defendants and otherwise fully performed under their HELOCs with Defendants.

62.   The credit limit under the Class members' HELOCs was a material term of the contract between Class members and Defendants.

63. Defendants materially breached the terms of the HELOCs by reducing the credit limit for Walsh and other Class members' HELOCs where no significant decline in value had first occurred.

64. As a result, Walsh and the other Class members have suffered damages in the form of the appraisal fees, the increased price of credit, lost interest, attorneys' fees, adverse effects on Plaintiff's credit score, and other damages.

65. Walsh, on his own behalf and behalf of the other Class members, seeks damages for Defendants' breach of contract, as well as interest and attorney's fees and costs pursuant to Cal. Code Civ. Proc. § 1021.5.

**Count V: Breach of Implied Covenants**
**(on behalf of Walsh and the Class and Subclass against WAMU and Chase)**

66. Plaintiff incorporates the above allegations by reference.

67. Walsh and the other Class members obtained HELOCs from Defendants. The terms of these HELOCs constitute a contract between the Class members and Defendants.

68. Implicit in the HELOC agreements were contract provisions that prevented the Defendants from engaging in conduct which frustrates the Class members' rights to the benefits of the contract or which would injure the right of the Class members' to receive the benefits of their HELOCs.

69. The credit limit was a material term of the Class members' HELOCs. Defendants breached the implied covenant of good faith and fair dealing in the HELOCs by reducing the credit limit for Walsh and other Class members' HELOCs without first having a sound factual basis for claiming there was a decline in value.

70. Defendants further breached the implied covenant of good faith and fair dealing to the Subclass by failing to provide sufficiently specific notice and by failing to provide customers with material information regarding the calculations and values used to justify the reductions or freezes.

71. Implicit in the HELOC agreements were contract terms that required Defendants to follow Regulation Z.

72.   Defendants' breach of Regulation Z and the HELOC covenants caused Walsh and other Class members to incur damages in the form of appraisal fees, the increased price of credit, adverse effects on Plaintiff's credit score and other damages.

73.   Walsh, on his own behalf and behalf of the other Class and Subclass members, seeks damages for Defendants' breach of the implied covenant of good faith and fair dealing, as well as interest and attorney's fees and costs pursuant to Cal. Code Civ. Proc. § 1021.5.

### Count VI: Unjust Enrichment/Restitution
### (on behalf of Walsh and the Class and Subclass)

74.   Plaintiff incorporates the above allegations by reference.

75.   In the alternative, and in the event this Court finds that no contract provision expressly governs the issues raised herein, Defendants have knowingly received and retained benefits from Plaintiff and the Class and Subclass members under circumstances that would render it unjust to allow  Defendants to retain such benefits.

76.   By using inaccurate and unsubstantiated valuation models, and by using "triggering events" that fall outside those permitted by Regulation Z to reduce the HELOCs while requiring Plaintiff and members of the Class and Subclass to obtain appraisals to reinstate the HELOCs, Defendants knowingly received and appreciated the benefits of current appraisals on homes in which they have security interests under circumstances where it would be unjust for Defendants not to bear the cost of the appraisals.

77.   Furthermore, by illegally freezing and reducing the HELOCs, Defendants gained the time value of the money it would otherwise be potentially liable for lending out to its HELOC customers.

78.   As an actual and proximate result of Defendants' conduct, Plaintiff and the Class and Subclass members have incurred damages in the form of appraisal

fees, the increased price of credit, adverse effects on their credit score and other damages.

79. Walsh, on his own behalf and behalf of the other Class and Subclass members, seeks damages for Defendants' breach of the implied covenant of good faith and fair dealing, disgorgement of all revenue and profits gained through its breach of the implied covenant of good faith and fair dealing, as well as interest and attorney's fees and costs pursuant to Cal. Code Civ. Proc. § 1021.5.

**Count VII: Violation of California's UCL, Cal. Bus. & Prof. Code § 17200**
**(on behalf of Walsh and the Class)**

80. Plaintiff incorporates the above allegations by reference.

81. Defendants' reduction of the credit limit for Walsh and other Class members' HELOCs violated TILA and Regulation Z. With respect to the Class, Defendants' conduct was deceptive and untrue as the AVM models used to determine the values of the properties securing such HELOCs were, on information and belief and as alleged above, without a sound factual basis, and inaccurate and unsubstantiated so as to make their use unfair, deceptive and readily subject to manipulation. Furthermore, Defendant used standards and triggering events to lower lines when significant declines had not occurred. Given all of the other allegations in this Complaint, Defendants' acts alleged herein were unfair. These unlawful, deceptive, and unfair acts and practices constitute unfair competition in violation of the UCL.

82. Defendants have engaged in unfair, unlawful and fraudulent business acts and practices as set forth above.

83. Defendants have violated the "unfair" prong of the UCL in that Defendants' actions caused substantial injury to consumers; the injury caused by Defendants' conduct is not outweighed by any countervailing benefits to consumers or competition; and the injury is one that consumers themselves could not reasonably have avoided.

84.   Defendants have violated the "fraudulent" prong of the UCL in that Defendants' statements regarding the availability of credit through the HELOCs were false and were likely to deceive a reasonable consumer.   Further, Defendants' statements regarding any potential future reduction of credit through the HELOCs would only occur through a substantial decline in value were false and were likely to deceive a reasonable consumer.

85.   Defendants have violated the "unlawful" prong of the UCL in that Defendants' conduct was undertaken in violation of TILA and Regulation Z.

86.   Defendants' violations of the UCL caused Walsh and the other Class members to pay money to Defendants in the form of fees, lost interest, opportunity, adversely impacted credit and other damages.

87.   Plaintiff and the Class members have suffered adverse effects their credit scores, attorneys' fees and other damages.

88.   Walsh, on his own behalf and behalf of the other Class members, seeks an order preliminarily and permanently enjoining Defendants' unfair competition alleged herein and requiring Defendants to restore HELOC credit limits and cease freezing HELOCs in violation of Regulation Z, and individual restitution of property gained by such unfair competition under the UCL (Cal. Bus. & Prof. Code § 17203), as well as interest and attorney's fees and costs pursuant to Cal. Code Civ. Proc. § 1021.5.

### Count VIII: Violation of California's UCL, Cal. Bus. & Prof. Code § 17200
### (on behalf of Walsh and the Notice Subclass)

89.   Plaintiff incorporates the above allegations by reference.

90.   Defendants' form letter and customer service experience lacks necessary details and information, including the specific reasoning for suspending or reducing the HELOC credit limits and sufficient information to allow customers to determine whether an appraisal should be ordered.

91.   Defendants have engaged in unfair, unlawful and fraudulent business acts and practices as set forth above.

92.   Defendants have violated the "unfair" prong of the UCL in that Defendants' actions caused substantial injury to consumers; the injury caused by Defendants' conduct is not outweighed by any countervailing benefits to consumers or competition; and the injury is one that consumers themselves could not reasonably have avoided.

93.   Defendants have violated the "fraudulent" prong of the UCL in that Defendants' statements regarding the availability of credit through the HELOCs were false and were likely to deceive a reasonable consumer.  Further, Defendants' statements regarding the notice of any potential future reduction of credit through the HELOCs would only occur in a timely manner (within three business days) were false and were likely to deceive a reasonable consumer.

94.   Defendants have violated the "unlawful" prong of the UCL in that Defendants' conduct was undertaken in violation of TILA and Regulation Z.

95.   Walsh, on his own behalf and behalf of the other Notice Subclass members, seeks an order preliminarily and permanently enjoining Defendants' unfair competition alleged herein, and requiring Defendants to restore HELOC credit limits and cease freezing HELOCs in violation of Regulation Z, and individual restitution of property gained by such unfair competition under the UCL (Cal. Bus. & Prof. Code § 17203), as well as interest and attorney's fees and costs pursuant to Cal. Code Civ. Proc. § 1021.5.

WHEREFORE, Plaintiff prays that the Court enter judgment and orders in their favor and against Defendants as follows:

(a)     Certifying the action as a class action and designating Plaintiff and his counsel as representatives of the Class and Subclass;

1       (b)     Declaratory judgment under 27 U.S.C. § 2201 on Count I that the

2  Defendants' HELOCs reductions violate federal law;

3       (c)     Statutory damages under 15 U.S.C. § 1640(a)(2)(B) for Count II;

4       (d)     Actual damages for the Subclass on Counts III, V, VI and VIII,

5  including but not limited to appraisal fees, the increased price of credit, NSF fees,

6  attorney's fees, interest and other damages in an amount to be proved at trial;

7       (e)     Actual damages on Counts II, IV, V, VI and VII for the Class including

8  but not limited to appraisal fees, the increased price of credit, NSF fees, attorney's

9  fees, interest and other damages in an amount to be proved at trial;

10      (f)     Preliminary and permanent equitable and injunctive relief for the Class,

11  including enjoining the Defendants from further violations of Regulation Z and

12  restoration of HELOC credit limits, including restitution of property gained by the

13  unfair competition alleged herein, and an order for accounting of such property;

14      (g)     Preliminary and permanent equitable and injunctive relief for the

15  Subclass, including enjoining the Defendants from further violations of Regulation

16  Z, and restoration of HELOC credit limits restitution of property gained by the

17  unfair competition alleged herein, and an order for accounting of such property;

18      (h)     Awarding pre- and post-judgment interest; and

19      (i)     Granting such other and further relief as the Court may deem just and

20  proper.

21

22  Dated: June 18, 2009          By:

                                David C. Parisi (SBN 162248)

23                             Suzanne Havens Beckman (SBN 188814)

                                Parisi & Havens LLP

24                             15233 Valleyheart Drive

                                Sherman Oaks, CA 91403

25                             Phone: (818) 990-1299

                                Fax: (818) 501-7852

26                             dparisi@parisihavens.com

                                shavens@parisihavens.com

27

28

1

# JURY TRIAL DEMAND

2

3     The Plaintiff hereby demands a trial by jury of all issues so triable.

4

5  Dated: June 18, 2009               By:

                                        David C. Parisi (SBN 162248)
6                                       Suzanne Havens Beckman (SBN 188814)
                                        Parisi & Havens LLP
7                                       15233 Valleyheart Drive
                                        Sherman Oaks, CA 91403
8                                       Phone: (818) 990-1299
                                        Fax: (818) 501-7852
9                                       dparisi@parisihavens.com
                                        shavens@parisihavens.com
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 1



# WaMu°

PO Box 100569
Florence, SC 29502-0569

04-17-2009



Loan Number Ending In:

Additional Borrowers:
Walsh, Michael J

Property Address:

### IMPORTANT NOTICE ABOUT YOUR HOME EQUITY LINE OF CREDIT

Dear Customer:

We are committed to the financial well-being of our customers and assisting them to achieve and preserve homeownership. As a valued customer we are contacting you with important information regarding the Home Equity Line of Credit (HELOC) referenced above.

With home values continuing to fall in many parts of the country, a recent review of your account identified a decline in the value of the property securing your HELOC since the date you applied for your HELOC or HELOC increase. Unfortunately, the new value no longer supports the full credit line. Therefore, the credit limit on your account has been reduced to $16,300.00 effective 04-16-2009.

What does this mean for you?

- You may continue to make new advances on your account up to the new credit limit.
- Your account is not closed and will not be reported as closed to any of the credit bureau agencies.
- This reduction was not based on your payment record and results exclusively from a change in property value.
- While we believe the updated property value to be accurate, if you dispute the value determination we offer an appeal process. Please see the FAQ section on the following page for information regarding the appeal process.
- We understand this action may affect your financial goals. Therefore, while we truly appreciate your business, should you choose to payoff and close your account within 90 days of this notice we will waive any associated cancellation fees.

We strive to provide our customers with the highest level of service. Many commonly asked questions are answered via the FAQ section on the following page. If you have additional questions please contact us toll free at (877) 750-6825, Monday through Friday 5:00 a.m. to 6:00 p.m. and Saturday 5:00 a.m. to 2:00 p.m., Pacific Time. If you are a hearing impaired customer, please contact us at (800) 841-1743 (TDD), Monday through Friday 6:00 a.m. to 7:00 p.m. and Saturday 6:00 a.m. to 5:00 p.m., Pacific Time.

Sincerely,

Washington Mutual Bank, a division of
JPMorgan Chase Bank, N.A.

IQCLD1

1of 2

 **WaMu°**

PO Box 100569
Florence, SC  29502-0569

### Frequently Asked Questions

**Q: Why has my credit line been reduced?**
A: We've used a proven valuation method to estimate your home's value. Unfortunately, that valuation no longer supports the full amount of your Line of Credit, so the credit limit on your account has been reduced, as of the date of this letter.

**Q: What value did you use for my property?**
A: We will be happy to provide this information.  Please contact us toll free at (877) 750-6825, Monday through Friday 5:00 a.m. to 6:00 p.m. and Saturday 5:00 a.m. to 2:00 p.m., Pacific Time.

**Q: How did you obtain the value for my property?**
A: We use a standard method within the industry to obtain an updated value on the property.

**Q: What can I do if I disagree with the decline in my property value?**
A: We offer an appeal process. Please call us via the contact information on the previous page and we will be happy to assist you with getting it started.

**Q: What can I expect from the appeal process?**
A: If you believe that the value of your property has been sufficiently restored, it will be your responsibility to call us via the contact information on the previous page to initiate your appeal. We will submit a request on your behalf to obtain an appraisal. A third-party independent appraisal management company will contact you directly to schedule a date and time to conduct the appraisal. The completed appraisal, along with a written request for reinstatement, should be faxed *by you* to 1-866-272-9223, or mailed to the address below, for review.

Washington Mutual, a division of JPMorgan Chase Bank, N.A. Consumer Lending Support MB0402FL P.O.
Box 3990 Melbourne, FL 32902-3990

Please note that any reinstatement of the credit line will be subject to our determination that no other conditions justify suspension of the account.

**Q: What is the cost of the appraisal?**
A: The cost varies based on the type of appraisal service your property will require. You will be responsible for the appraisal fee. The appraisal management company will review the type and cost with you prior to any work being completed.

**Q: Can I provide an appraisal I have already or local sales listings to appeal the value?**
A: Unfortunately, we are unable to use this appraisal or any local sales listings. However, we do suggest that you review local sales for comparable properties in order to make an informed decision before requesting to have an appraisal order placed.

**Q: Can I appeal the property value in the future once the value of my home is restored, or if I've completed home improvement upgrades?**
A: Yes, you may submit a request for reinstatement by following the same appeal process noted above.

**Q: How will this affect outstanding transactions or checks?**
A: Checks, MasterCard transactions, or advances that were negotiated or authorized before the line was decreased will be considered for payment. Please contact us to review the transactions that have posted to your account.

**Q: Where in my loan documents does it say that you can reduce the amount of my credit line?**
A: Federal law (Truth in Lending Act/Regulation Z) allows home equity creditors to freeze the credit line or reduce the credit limit if there has been a significant decline in collateral value. That authority is normally found in the HELOC Agreement under the section titled "Termination and Acceleration; Suspension of Advances and Reduction of Credit Limit; Other Remedies" section of your WaMu document.

### Equal Credit Opportunity Act

The federal Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, age (provided the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The federal agency that administers compliance with this law concerning this creditor is: Office of the Comptroller of the Currency, Customer Assistance Group, 1301 McKinney St., Suite 3450, Houston, Texas 77010-9050.

# Exhibit 2

**TESTIMONY OF JAMIE DIMON**
**CHAIRMAN & CEO, JPMORGAN CHASE & CO.**
**HOUSE FINANCIAL SERVICES COMMITTEE**
**FEBRUARY 11, 2009**

Chairman Frank, Ranking Member Bachus, Members of the Committee, my name is Jamie Dimon, and I am the Chairman and Chief Executive Officer of JPMorgan Chase & Co. I am pleased to be here today to assure the Committee that we at JPMorgan Chase are doing everything we can to help restore confidence in the U.S. financial system and to ensure that we are fulfilling our responsibilities under the Troubled Asset Relief Program (TARP) as Congress intended: to restore liquidity and stability to the U.S. financial system, to ensure the continued flow of credit to consumers and businesses, and to encourage modification of residential mortgages.

Of course, even before TARP, JPMorgan Chase entered into two transactions to help stabilize our financial system and protect consumers and taxpayers from potentially catastrophic losses: the merger with Bear Stearns back in March of last year; and the purchase of Washington Mutual assets some six months later. While we believed that each of these transactions would produce long-term benefits for our franchise, each also entailed significant risk. Subsequent to those transactions, the government asked us to participate in the Capital Purchase Program established under TARP.

As this Committee is aware, JPMorgan Chase did not seek the government's investment. But we agreed to support the government's goal of obtaining the participation of all major banks. The funds we received strengthened our already strong capital base, which is the foundation of all of our lending activities (including our mortgage modification efforts, described in detail below). We have paid and will continue to pay dividends on the government's investment -- $1.25 billion on an annual basis. In this context, I want to provide the Committee with an update on JPMorgan Chase's post-TARP lending activity.

But before I do that, I want to spend a minute on who we are. While some may think of us as a Wall Street firm, we are very much a part of Main Street. Our 5,000 branches serve customers in 23 states. We employ 174,000 people in 49 states -- 125,000 of them outside the New York metropolitan area. We provide health care coverage for 417,000 people. We have long-standing relationships with over 400,000 small businesses. More than 50 million Americans own JPMorgan Chase shares, often through their retirement plans. On average, we pay more than $10 billion a year in taxes to the federal government, as well as state and local jurisdictions. Last year, our Foundation made charitable contributions of approximately $100 million across the U.S. Our people are ingrained in the communities we serve. We thrive when those communities are healthy, secure and prosperous.

**Lending to consumers, businesses and governments**

JPMorgan Chase continues to provide significant levels of credit to our customers, whether individual consumers, small businesses, large corporations, not-for-profit organizations, state and local governments or other banks. Since we received the capital investment under TARP on

October 28, 2008, our lending volumes have been significant, particularly in light of the rapidly deteriorating economic environment. Whenever we lend, but especially now, we must do so in accordance with prudent risk management and underwriting standards, mindful of market and credit risks. We should not forget that eroding credit standards by many market participants played a large role in creating the current economic malaise. The challenging economic conditions we face today only elevate the importance of operating in a safe and sound manner and maintaining what we believe to be a strategic imperative: a "fortress balance sheet."

In the fourth quarter of 2008, we made over $150 billion of new loans, including the following:

- Over $50 billion in new consumer originations – representing over 5 million new loans and lines to consumers (*e.g.,* for mortgages, home equity loans and lines, credit cards, student loans, auto loans, etc.). Through this activity, we helped more than 75,000 families acquire homes or lower the interest rate on their mortgages.
- Over $20 billion in new credit extended[1] to 8,000 small and mid-sized businesses, governments and non-profits; in addition, we committed to extend an incremental $5 billion in lending to the government and non-profit sector over the next year and were the only investor willing to step up to purchase a recent $1.4 billion bond offering by the State of Illinois.
- An additional total of approximately $90 billion in new and renewed commitments to our corporate and other clients.

We also dramatically increased our presence in the interbank market, lending an average of $50 billion a day to other banks – which provided much needed liquidity to the system. Including interbank lending, our aggregate new lending for the fourth quarter was over $200 billion.

Also during the fourth quarter, we purchased almost $60 billion of mortgage-backed and asset-backed securities, which had the benefit of supporting the agency debt markets and promoting liquidity in the housing capital markets.

In sum, our consumer loan balances increased by 2.1 percent in the fourth quarter,[2] while overall personal consumption expenditure in the country decreased by 2.3 percent over the same period. That is to say, we lent more even as consumers cut back on their spending during the quarter.[3]

JPMorgan Chase's lending volumes in the fourth quarter are especially significant in light of the continued deterioration of the economy in the U.S. and globally and a steep decline in demand for credit. The stock market is down 21 percent since the passage of the Emergency Economic Stabilization Act, the United States lost 1.5 million jobs in the fourth quarter, and home values have continued to fall. This dismal picture is reflected in business and consumer sentiment: confidence of small businesses has eroded steadily to the lowest level on record since 1908; surveys of investor sentiment show investor confidence has fallen to half the level seen early

---

[1] New commitments and renewals
[2] $483B vs. $473B
[3] Source: our supplement for our loans and the Bureau of Economic Analysis for U.S. Personal Consumption Expenditure.

last year; and consumer confidence levels as reported by the Conference Board have plummeted over the course of 2008 from 91 to 38.

In short, banks like JPMorgan Chase are continuing to lend in this environment. The significant tightening of credit that we have all seen over the last several months must be understood in the wider context of the overall credit markets. Nonbank lenders, such as money market funds and hedge funds, constitute 70 percent of our nation's credit markets --providing credit, for example, through their holdings in commercial paper. Understandably, as their own investors have pulled back, these institutions have done the same, either by not extending any credit or by dramatically shortening the duration of the commercial paper they are willing to purchase. The result has been a further tightening of liquidity in the financial markets.

**Keeping families in their homes**

At JPMorgan Chase, we are not only continuing to lend; we are also at the forefront in doing everything we can to help families meet their mortgage obligations and keep them in their homes. Even before the current housing crisis began, we had undertaken foreclosure prevention efforts designed to do just that. We believe that it is in the best interests of both the home owner and the mortgage holder to take corrective actions as early as possible – in some cases even before default occurs. Our foreclosure prevention efforts include both the $330 billion of loans that we own and the $1.1 trillion investor-owned loans that we service. We expect to help avert 650,000 foreclosures by the end of 2010. We have already helped prevent more than 330,000 foreclosures and have done so in a way that averts re-default by achieving long-term, sustainable mortgage payments.

We are well underway to implementing the commitments we made in announcing this foreclosure prevention plan. In particular, we have:

- Delayed starting foreclosure on over $22 billion of Chase-owned mortgages held by more than 80,000 homeowners so that Chase could review those mortgages for possible modification.
- Commenced mailing proactive modification offers to borrowers of Chase-owned loans at imminent risk of default.
- Selected sites for 24 Chase Homeownership Centers in areas with high mortgage delinquencies where counselors can work face-to-face with struggling homeowners. We will have 14 centers – 9 in California and 5 in Florida – open and serving borrowers by the end of the month and the remaining 10 by the end of next month.
- Added 300 new loan counselors to provide better help to troubled borrowers, bringing the total number of counselors to more than 2,500.
- Initiated an independent review process to ensure each borrower was contacted properly and, if and as appropriate, offered modification prior to foreclosure.
- Developed a robust financial modeling tool to analyze and compare the net present value of a home in foreclosure to the net present value of a proposed

- Worked to help establish a non-profit clearinghouse to join Chase and other lenders who want to donate or sell at a discount their owned real estate to non-profit and government agencies that can use these properties.
- Worked with Fannie Mae and Freddie Mac to implement their new Streamlined Modification Program for borrowers at least 90 days delinquent; we have mailed more than 28,000 letters in the past several weeks.

We believe that programs like ours are the right approach for the consumer and for the stability of our financial system as a whole. We would urge that the Administration adopt a uniform national standard for such programs and otherwise do whatever it can to ensure that sensible modification efforts short of bankruptcy are undertaken as broadly and consistently as possible.

**Compensation policies aligned with long-term performance**

I know that many Americans are concerned about compensation practices across the financial services industry – and I think some of those concerns are quite legitimate. At JPMorgan Chase, we have long adhered to compensation practices that were designed to reward long-term performance, not just revenues, and aimed to align employee and shareholder interests. Before the TARP program was conceived, we used a multi-year approach to compensation, weighed risk management as part of our performance evaluations, had a bonus recoupment policy beyond that required under Sarbanes-Oxley, and did not use golden parachutes or many other perquisites. We have always paid a significant percentage of our incentive compensation in stock (50 percent for our most senior management group) and require this group to hold 75 percent of their stock until retirement.

And for us, incentive compensation is not a perquisite given exclusively to senior officers and investment bankers. It is part of our regular compensation given to employees across the firm, including retail branch and credit card personnel, technology experts, and compliance and support professionals. Each employee is paid based on a combination of individual performance, business unit performance and the performance of the firm as a whole.

I took no bonus for 2008 in any form, cash, stock, or options. I judged that it was appropriate for me, as the leader of a major financial firm in the current environment, to forgo a bonus last year. Many of our employees took significant cuts in compensation, and the more senior executives took the larger percentage cuts. For our most senior management group, incentive compensation declined more than 60 percent. For the Firm as a whole, average incentive compensation per employee was down 38 percent. (Average *cash* incentive compensation was down by 43 percent.) This is true even though, during one of the most tumultuous periods our economy has ever experienced, we earned a profit in every quarter and executed the Bear Stearns and Washington Mutual transactions. Our employees worked harder than ever and performed admirably for the company and for clients under enormously challenging conditions in 2008. I believe the compensation we paid them was appropriate.

**State of the Financial Industry**

Before I conclude, I should address the Committee's request for comment on the state of the financial industry. These are obviously challenging times. The government, in my view, has taken bold and necessary steps to keep this crisis from becoming something that none of us would want to imagine. Congress will be tackling many more challenges in the months ahead and we stand ready to work with you on the range of issues confronting the financial services sector and our economy as a whole. One issue I do want to touch on briefly is the need for regulatory modernization. For in my view, long-term recovery will elude the financial industry unless we modernize our financial regulatory system and address the regulatory weaknesses that recent events have uncovered.

The ongoing financial crisis has exposed significant deficiencies in our current regulatory system, which is fragmented and overly-complex. Maintaining separate regulatory agencies across banking, securities and insurance businesses is not only inefficient, but also denies any one agency access to complete information needed to regulate large diversified institutions effectively and maintain stability across the financial system. It also results in uneven and inequitable regulation of similar activities and products across different institutions.

I am in complete agreement with Chairman Frank that Congress and the President should move ahead quickly to establish a systemic risk regulator. In the short-term, this would allow us to begin to address some of the underlying weaknesses in our system and fill the gaps in regulation that contributed to the current situation.

As part of a longer-term modernization discussion, we stand ready to work with Congress and others to think through any number of complex issues. But waiting for the larger debate over regulatory reform to play out could take months. Every credible regulatory modernization plan includes the creation of a systemic risk regulator, and everyone agrees that this needs to be done – and done right away. I hope Congress will act to get this critical building block in place.

**Conclusion**

There are tremendous challenges facing the financial services industry and the American economy. I look forward to working with this Committee to address those challenges, to help find solutions to our current economic problems, to keep American families in their homes and to begin to restore confidence in our financial markets.

David C. Parisi (162248)
Suzenne Havens Beckman (188814)
PARISI & HAVENS LLP
15233 Valleyheart Drive
Sherman Oaks, CA 91403

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL WALSH, an individual, on his own behalf and on behalf of all others similarly situated <br> PLAINTIFF(S) <br><br> v. <br><br> WASHINGTON MUTUAL BANK, HENDERSON, NEVADA; JPMORGAN CHASE BANK, N.A.; and DOES 1 through 50, Inclusive <br><br> DEFENDANT(S). | CASE NUMBER <br><br> **CV09-4387 RSWL(ANX)** <br><br><br> **SUMMONS** |

TO:     DEFENDANT(S): _____

A lawsuit has been filed against you.

Within __20__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, _David C. Parisi_____, whose address is _15233 Valleyheart Drive, Sherman Oaks, CA 91403_____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: ___JUN 1 8 2009_____          By: ___Nancy Castro___
                                              Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐)<br>Michael Walsh | DEFENDANTS<br>Washington Mutual Bank, Henderson, Nevada; JPMorgan Chase Bank, N.A.,<br>Does 1 through 50 |
|---|---|
| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing<br>yourself, provide same.)<br>David C. Parisi (818) 990-1299<br>Parisi & Havens LLP<br>15233 Valleyheart Drive, Sherman Oaks, CA | Attorneys (If Known) |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff    ☑ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant    ☑ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☑ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☑ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding    ☐ 2 Removed from State Court    ☐ 3 Remanded from Appellate Court    ☐ 4 Reinstated or Reopened    ☐ 5 Transferred from another district (specify):    ☐ 6 Multi-District Litigation    ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☑ Yes ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☑ Yes ☐ No    ☑ **MONEY DEMANDED IN COMPLAINT:** $ dam., equity & injunctive relief

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
TILA, Regulation Z, Breach of contract, Bad Faith, Unjust Enrichment, Declaratory Relief

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS<br>PERSONAL INJURY | TORTS<br>PERSONAL PROPERTY | PRISONER<br>PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☑ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | **CIVIL RIGHTS** | **FORFEITURE / PENALTY** | **PROPERTY RIGHTS** |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | | **SOCIAL SECURITY** |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 445 American with Disabilities - Employment | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | **IMMIGRATION** | | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | **REAL PROPERTY** | ☐ 462 Naturalization Application | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 463 Habeas Corpus-Alien Detainee | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 465 Other Immigration Actions | | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determination Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | | | | **FEDERAL TAX SUITS** |
| | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

## CV09-4387 RSWL(ANX)

**FOR OFFICE USE ONLY:**    Case Number: _____

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

## CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☑ No ☐ Yes
If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**
(Check all boxes that apply)  ☐ A.  Arise from the same or closely related transactions, happenings, or events; or
  ☐ B.  Call for determination of the same or substantially related or similar questions of law and fact; or
  ☐ C.  For other reasons would entail substantial duplication of labor if heard by different judges; or
  ☐ D.  Involve the same patent, trademark or copyright, _and_ one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☑  Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange County, California | |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐  Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Nevada - Washington Mutual Bank, Henderson, Nevada<br>Ohio - JPMorgan Chase Bank, N.A. | |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
  **Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange County, California | |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): _David C. Parisi_    Date June 18, 2009

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |